

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| **BENJAMIN BANNEKER CHARTER ACADEMY, ET AL.,** | **WD81967** |
| **Appellants,** | **OPINION FILED:** |
| **v.** | **AUGUST 13, 2019** |
| **MICHAEL JONES, ET AL.,** | |
| **Respondents.** | |

**Appeal from the Circuit Court of Cole County, Missouri**
**The Honorable Patricia S. Joyce, Judge**

**Before Division Four: Karen King Mitchell, Chief Judge, Presiding, Anthony Rex Gabbert, Judge, Timothy J. Flook, Special Judge**

Benjamin Banneker Charter Academy, Inc., et al,[1] ("Banneker") appeal a Judgment in favor of Respondents (the University of Central Missouri ("UCM"), the Missouri Department of Elementary and Secondary Education ("DESE"), the Missouri State Board of Education ("SBE"), and individual members of the SBE), on Banneker's "Verified Petition for Breach of Contract, Violation of Civil Rights, Declaratory Judgment, and Injunctive Relief." Banneker claims on appeal that, 1) the circuit court erred in entering judgment against Banneker on Banneker's breach

---

[1] Appellants include Benjamin Banneker Charter Academy of Technology, Inc., Tracie Thomas, as parent of and on behalf of A.C., Rosemary Babalola, as parent of and on behalf of P.B., Monnarika Clark, as parent and on behalf of M.C., Seville Oliver, as parent and on behalf of M.W. II, Jeulanda Floyd, as parent and on behalf of J.J.

of contract claim because injunction was a viable remedy, entitlement to which Banneker established, 2) the circuit court's finding that Banneker failed to establish intentional discrimination was against the weight of the evidence, and 3) the circuit court's conclusion that Banneker was not entitled to declaratory relief was contrary to the law and against the weight of the evidence. We dismiss this appeal as moot.

## Background Information

Banneker filed a petition March 14, 2018, alleging that Banneker Charter Academy, in conformity with Missouri's Charter School Law, entered into a Charter School Contract with UCM expiring June 30, 2018. On October 27, 2017, UCM informed Banneker that, upon expiration, UCM would not renew the contract. Banneker's petition alleged that, in assessing the renewal of Banneker Charter Academy's Charter School Contract, UCM failed to meet its contractual obligation to base its renewal decision on a thorough analysis of a comprehensive body of objective evidence as required by Section 160.405.4(6)(b)[2] and 5 CSR 20-100.260(8)(A)[3] (Count I, breach of contract claim). Section 160.405.4(6)(b) states that "Student performance shall be assessed comprehensively to determine whether a high-risk or alternative charter school has documented adequate student progress. Student performance shall be based on sponsor approved comprehensive measures as well as standardized public school measures." 5 CSR 20-100.260(8)(A) states that sponsors are to use comprehensive academic, financial, and operational management data to make decisions about renewal and closure. Further, sponsors are to base renewal decisions on "thorough analyses of a comprehensive body of objective evidence defined

---

[2] All statutory references are to the Revised Statutes of Missouri as updated through 2018 unless otherwise noted.

[3] All regulatory references are to the Missouri Code of State Regulations (July 30, 2017).

by the performance framework in the charter contract" and "grant renewal only to schools that have achieved the standards and targets stated in the charter contract, are organizationally and fiscally viable, and have been diligent to the terms of the contract and applicable law."

Banneker further alleged that UCM failed to meet its contractual obligations by relying on Annual Performance Report [APR] scores because, "[a]lthough such scores appear to be a facially neutral standard to gage [sic] student and school performance, all schools are required to reach a one-size-fits-all 70% APR ranking to remain viable." Banneker argued that, "Missouri's Charter School Laws as implemented by the SBE, DESE, and the named defendants, treat charter schools differently than public schools and authorize sponsors to make renewal decisions without considering whether sponsors are complying with contractual and statutory obligations." Banneker alleged that, since 1999, there have been sixty-three charter school districts, with twenty-one of those having closed "for allegedly inferior performance or operational reasons, thereby further victimizing 'high risk' and 'at-risk' charter school students in a disproportionate adverse manner unlike other students in Missouri Public Schools."

Banneker alleged that Banneker's Charter School Contract had no mechanism for appealing a non-renewal decision based on UCM's alleged failure to take into account the comprehensive body of evidence identified by Banneker as necessary for proper review of the charter renewal. Banneker further alleged that UCM failed to establish procedures to be implemented for closing the charter school as required by law. Banneker asked the court to enjoin and restrain Respondents from their actions.

In Count II and Count III of Banneker's petition, Banneker alleged that Respondents unlawfully and intentionally discriminated against Banneker plaintiffs and violated their equal protection rights by, on the basis of race and color and in violation of the Title VI of the 1964 Civil

3

Rights Act, excluding Banneker plaintiffs from participation in a program or activity covered by Title VI. Banneker contended that closing Banneker Charter Academy was discriminatory against the predominately African American Banneker Charter Academy students, arguing that similarly situated Missouri students from predominately white public schools did not have their schools immediately closed and sold, with students being sent to multiple locations, when the districts did not meet a 70% APR rating.

Banneker alleged that charter schools were created as a direct response to and partial remedy for racial discrimination and segregation impacting African American students in the Kansas City Public Schools. Banneker contended:

> Despite the legal efforts to fashion a plan to desegregate schools within the area covered by the KCPS, Missouri's application of laws and regulations covering charter schools is nothing more than a continuation of state sanctioned, racially segregated, schools and school districts within Kansas City and the KCPS. The Charter School Laws, as applied, are a means to segregate, racially isolate, and treat African American students in a discriminatory manner because of their race.

Banneker's petition conceded that Missouri's Charter School Laws establish facially neutral academic performance standards by reviewing academic achievement in all public schools based on five performance standards. These include academic achievement, subgroup achievement, high school readiness or college/career readiness, attendance rate, and graduation rate. Statistics are compiled in an APR for each school, and all schools within Missouri are required to reach a 70% APR ranking score to "remain viable." Banneker alleged that, while facially neutral, the Charter School Laws are discriminatory "as applied." In support of this claim, Banneker's petition cites various statutes which Banneker contends show that the Charter School Laws "provide limited requirements and guidance for charter school sponsors." Further, that Section 160.405.4(6)(c) allows charter schools to be required to meet the same performance

4

standards as other public schools in Missouri, "even though such schools do not suffer the existential factors prevalent in charter schools." Banneker alleged that, use of the same standardized testing other public schools in Missouri utilize (specifically the Missouri Assessment Program or "MAP" test) results in racial discrimination when applied to charter schools because a "one-size-fits-all" approach is racially discriminatory. Banneker alleged that, although charter schools were created in Missouri to remedy racial discrimination and segregation, since their inception in 1998, the SBE, DESE, and other named defendants' application of a "one-size-fits-all" standard has resulted in 1/3 of all charter schools being closed, "which is clear evidence of the failure of this so called desegregation remedy." Banneker contended:

> This has occurred without regard to the lingering vestiges of a deliberate and intentional de jure segregation system maintained for more than a century. This one-size-fits-all assessment practice has resulted in constant disruption of the educational environment for 'at risk' and 'high risk' students in these predominately African American schools, while preserving the stability and continuity in predominantly white schools outside the KCPS boundaries.

Banneker alleged that, reliance on standardized test scores for nonrenewal of Banneker's contract failed to take into consideration that,

> Many students at charter schools … are African American, come from entirely different backgrounds where poverty, emotional issues, movement from school to school, and a host of many other existential issues prevail. The first concern of these students is their safety, while students at predominantly white schools are free to place their initial focus on learning.

Banneker alleged that, knowing these facts, and knowing standardized tests do not accurately measure the success of charter schools such as Banneker, the defendants used such scores to "intentionally weed out and end their charters" and, as a result, their actions and inactions were intentional, race based discrimination. Banneker alleged that, because the Charter Laws allow for closure of a charter school when a sponsor chooses not to renew a charter, and traditional public

5

schools with no sponsors are not subject to the same closures, the Charter Laws violate equal protection.

Banneker asked the court to issue a declaration that the defendants engaged in unlawful and intentional discrimination, issue an injunction, and "such other relief as the Court deems just and appropriate."

Count IV of Banneker's petition alleged that Banneker was facing loss of its charter which would result in damage to students moved to schools they did not want to attend, with available alternative schools insufficient to foster the success of Banneker Charter Academy's students. Banneker requested a preliminary injunction "to preserve the status quo pending resolution of this action," and also a permanent injunction. Banneker requested the court "issue an injunction, restraining order, and other relief, and ordering Defendants to stay all further action, provide continued funding to Banneker, require UCM to act as sponsor, and allow Banneker to operate for the summer school classes, and further allow Banneker to operate for the upcoming school year."

On June 21, 2018, the circuit court entered Judgment in favor of Respondents on all counts. The court identified Banneker's claims for relief as seeking "declaratory judgment respective to the various alleged violations and injunctive relief allowing the school to continue operating." On the breach of contract claim, the court found that the remedy sought by Banneker – to continue the contract beyond the date of termination through an order requiring its renewal – was a remedy unavailable to the court. The court noted that the remedies available for breach of contract claims are typically monetary damages and specific performance. On the civil rights claims, the court found that Banneker presented no evidence that UCM's decision not to renew the charter agreement was the result of intentional discrimination, or that the State administered Missouri's Charter School Laws in an intentionally discriminatory manner. The court found that the State

6

presented unrebutted testimony that the Charter School Laws are applied equally throughout Missouri to all charter schools, and that the testing and assessment standards were reviewed and approved by the Federal Government. Regarding Banneker's claim for declaratory judgment and injunctive relief, the court found that Banneker failed to establish that Respondents violated Banneker's rights. Further, the court had no authority to compel any entity to enter into a contract, and no authority to enter an order in violation of the law. This appeal follows.

**Analysis**

Banneker asks this court to review whether the circuit court erred in determining that an injunction was not a viable remedy for Respondents' alleged breach of contract, whether the court's finding of no intentional discrimination was against the weight of the evidence, and whether the court erred in finding Banneker not entitled to declaratory relief.

"In any appellate review of a controversy, a threshold question is the mootness of the controversy." *Grzybinski v. Dir. of Revenue*, 479 S.W.3d 742, 745 (Mo. App. 2016). When the question presented seeks a judgment that would have no practical effect on an existing controversy, the matter is moot. *State ex rel. Chastain v. City of Kansas City*, 968 S.W.2d 232, 237 (Mo. App. 1998). In determining mootness, the appellate court may consider facts outside the record. *State ex rel. Monsanto Co. v. Pub. Serv. Comm'n of Missouri*, 716 S.W.2d 791, 793 (Mo. banc 1986). "When an event occurs that makes a court's decision unnecessary or makes it impossible for the court to grant effectual relief, the case is moot and generally should be dismissed." *In re Sw. Bell Tel. Co.'s Proposed Revision to Gen. Exch. Tariff, P.S.C. Mo--No. 35*, 18 S.W.3d 575, 577 (Mo. App. 2000) (internal quotation marks and citations omitted). An actual controversy susceptible of some relief must exist in order for this court to have jurisdiction. *State ex rel. Mo. Cable Television Ass'n v. Pub. Serv. Comm'n,* 917 S.W.2d 650, 652 (Mo. App. 1996).

7

There are two narrow exceptions to the mootness doctrine which allow an appellate court to exercise its discretion to consider an appeal. *State ex rel. Peters-Baker v. Round*, 561 S.W.3d 380, 394-385 (Mo. banc 2018). Those are, 1) where the case becomes moot after submission and argument, and 2) where the issue raised is one of general public interest and importance, recurring in nature, and will otherwise evade appellate review. *Id.*

On June 30, 2018, approximately one week after the circuit court entered its Judgment, the charter contract between Banneker and Respondents expired. The parties concede that Banneker Charter Academy closed and the school building was sold. The only remedial relief Banneker sought from the circuit court was an injunction. Given that Banneker Charter Academy has closed, an injunction, even if a viable avenue for relief at the time the court entered judgment, would now be ineffectual. It would be impossible for this court to enjoin Respondents from closing Banneker Charter Academy. *See Byrne & Jones Enterprises, Inc. v. Monroe City R-1 School District*, 493 S.W.3d 847, 856 (Mo. banc 2016).

We disagree with Banneker's contention that Banneker's request for "such other relief as may be proper" was a claim for damages that precludes mootness. On appeal, Banneker does not contest the court's finding within its Judgment that Banneker sought only injunctive and declaratory relief, and Banneker makes no claim the court erred in failing to *sua sponte* recognize and provide "other relief" not expressly requested.[4]

---

[4] In arguing on appeal that an injunction forcing UCM to contract to be Banneker Charter School's sponsor was a proper remedy for all Counts in the petition, Banneker states that "in the present case, no remedy at law would have provided Appellants with any relief…. Clearly, monetary damages could not fulfill the fundamental purpose of keeping Appellant Banneker operating as a charter school thereby allowing its students, including the named student Appellants, to continue to attend the school." Banneker argues that, "a judgment by this court would clearly have a practical impact because Banneker could resume its role as an active charter school and the rights of students and parents would be redressed."

Neither exception to the mootness doctrine is applicable here. This case was moot prior to submission and argument. Banneker argues that the public interest doctrine is implicated because, "given the number of charter schools in the State, the breaches that occurred with regard to Banneker's charter school contract as well as the issue of how the charter school statutes will be applied to other schools comprised of at-risk students are issues that will recur." We disagree. Breach of contract claims are typically fact specific to the contractual parties. If similar issues were to arise in other charter schools in Missouri, those schools and their sponsoring entities would have an opportunity to pursue appropriate legal action specific to the issues raised.

In *Hope Academy Corp. v. Missouri State Board of Education*, 462 S.W.3d 870, 876 (Mo. App. 2015), we reiterated our holding in *State ex rel. School District of Kansas City v. Williamson*, 141 S.W.3d 418, 425 (Mo. App. 2004), that, nowhere in The Charter Schools Act is a sponsor or charter school granted any right to renewal. We noted that our legislature had expressed a "legislative intent not to impose such criteria upon the sponsor's decision or to grant the charter school any right to renewal of its charter." *Hope Academy*, 462 S.W.3d at 876. "Pursuant to the Charter Schools Act, both the Board and DESE are utterly absent from a sponsor's decision not to renew a charter." *Id.* In rejecting Hope Academy's claim that the SBE and DESE had authority to reverse Hope Academy's sponsor's nonrenewal decision, we suggested the possibility of declaratory relief against the sponsor related to terms of the original agreement. *Id.*

Banneker asserts that it seeks exactly what *Hope Academy* suggested – redress for contractual violations by UCM. Yet, Banneker did not request declaratory judgment with regard to its contractual breach allegations; Banneker only requested injunctive relief. Further, declaratory judgment typically cannot be invoked where an adequate remedy already exists or where administrative remedies have not been exhausted. *See Snelling v. Kenny*, 491 S.W.3d 606,

615 (Mo. App. 2016); *State of Missouri ex rel. Ideker, Inc. v. Garrett*, 471 S.W.3d 743, 747 (Mo. App. 2015). Here, while the SBE and DESE may have had no authority to reverse or compel contract renewal, they had authority to review compliance with contractual terms and there is no indication in the record that they failed to do so or were notified, prior to suit being filed, of Banneker's specific contractual grievances. Section 160.400.17(1) states that the SBE shall ensure each sponsor is in compliance with all requirements under Sections 160.400 to 160.425 and 167.349. Section 160.400.17(1) further states:

> The state board shall notify each sponsor of the standards for sponsorship of charter schools, delineating both what is mandated by statute and what best practices dictate. The state board shall evaluate sponsors to determine compliance with these standards every three years. The evaluation shall include a sponsor's policies and procedures in the areas of charter application approval; required charter agreement terms and content; sponsor performance evaluation and compliance monitoring; and charter renewal, intervention, and revocation decisions. Nothing shall preclude the department from undertaking an evaluation at any time for cause.

Section 160.400.17(2) provides that, after evaluation, if the DESE finds a sponsor in material noncompliance with its sponsorship duties, the sponsor shall be notified and given reasonable time for remediation. If remediation does not address the compliance issues, a public hearing shall be conducted. *Id.* Resulting corrective action may include suspending the sponsor's authority to sponsor a school. *Id.* In such cases, "the Missouri charter public school commission shall become the sponsor of the school." § 160.400.17(4). Hence, there appears to be a mechanism within the statutes for review of contractual violations with regard to charter renewal, and also a mechanism for sponsorship transfer upon a determination that a sponsor has failed to take corrective action. Nothing within Banneker's pleadings suggests that the SBE or DESE failed or refused to comply with this statute.

10

Respondents' motions to dismiss, taken with the case, are granted. Banneker's appeal is dismissed.

_____
Anthony Rex Gabbert, Judge

All concur.